IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE COMPAK COMPANIES, LLC            )
                                     )
            Plaintiff,               )
                                     )
            v.                       )    No. 03 C 7427
                                     )
JIMMIE L. JOHNSON, RON BOWEN,        )
BRUCE CARLSON, PATPAK, INC.,         )
DUOTECH HOLDINGS, INC., DUOTECH      )
PACKAGING, LLC, OLMARC PACKAGING     )
COMPANY, and URBAN MINISTRIES,       )
INC.,                                )
                                     )
            Defendants.              )

**MEMORANDUM OPINION**

    This court has conducted a ten-day bench trial.  Our findings

of fact and conclusions of law are set forth below.  See Fed. R.

Civ. P. 52(a).

**FINDINGS OF FACT**

1.    Sometime in or before 1992 Jimmie Johnson invented a

"compartmental communion container" designed to hold a communion

wafer and sacramental wine or juice in separate compartments.  (PX

3.)

2.   Johnson applied to patent his invention on April 7, 1992.  (PX

3 (U.S. Patent No. 5,246,106 (the "'106 patent").)

3.   On July 9, 1992 Johnson sold his rights to the invention "and

any invention related thereto," including the patent application,

to a company called Compak International, Inc.  (See PX 4.)[1]

4.   The USPTO approved Johnson's application and issued the '106 patent on September 21, 1993.  (PX 3.)

5.   Between 1994 and 1998 Johnson applied for and received three additional patents covering dual-lid containers: U.S. Patent Nos. 5,456,351 (the '351 patent) (PX 9), 5,584,388 (the "'388 patent") (PX 10), and 5,746,312 (the "'312 patent") (PX 11) (collectively, the "Subsequent Patents").  Johnson later purported to assign the Subsequent Patents to PatPak, Inc., another company that Johnson had founded.

6.   Sometime in the mid-1990's Compak began leasing a machine custom-designed to manufacture its communion-cup product (the "CP-11" machine).  A German company, Klockner Medipak, Inc., owned the machine.

7.   The CP-11 machine was housed in a facility owned by defendant Olmarc Packaging Company ("Olmarc").  Olmarc operated the CP-11 machine, billed Compak's customers, collected payments, and then deducted labor and raw material charges, and its commission, before remitting the money to Compak.  (PX 139.)

8.   In 1998 BMJ Partners ("BMJ") made the first of three investments in Compak. JoeAnn McClandon, the CEO of plaintiff The Compak Companies, LLC ("TCC"), is one of BMJ's general partners.

9.   McClandon was aware as early as 1997 that Compak was marketing its communion-cup product under the trade name, "Celebration Cup."

---

[1]  Throughout this case, and without any objection by the defendants, the plaintiff has referred to Compak Corporation ("Compak") — a company that Jimmie Johnson founded — as the "Buyer" under the July 1992 Bill of Sale.  We conclude, then, that Compak and Compak International, Inc. are the same entity.

10.   In 1999, Compak and Urban Ministries, Inc. ("UMI") executed an agreement authorizing UMI to distribute the Celebration Cup. (PX 122.)   Thereafter, UMI's "Communion Source" division distributed the product.

11.     Communion Source registered the domain names "communionsource.com" and "celebrationcup.com" in or around 2000. The websites were "linked" at the time that they were registered — visitors to celebrationcup.com were automatically redirected to communionsource.com.  The evidence at trial supports the inference that the websites were linked at all times relevant to this lawsuit.

12.   Defendant Bruce Carlson testified that he learned about Compak in 2000 from Kenneth Binkley, his son's dentist.  Binkley is a cousin of defendant Ron Bowen, who was then a principal of Compak.

13.   In a rambling "Proposal" that Carlson submitted to Compak in January 2001 Carlson described himself as the head of a nebulous "consortium" of investors/entrepreneurs.   (PX 75.)   Carlson proposed, in effect, to take over Compak's operations.  (Id.)

14.   At some point in or around April or May 2001 Carlson began referring to his "group" as "Duo-Tech," although he had not yet formed a separate legal entity with that name.  (See, e.g., PX 78 (email from Carlson to Binkley attaching a "Duo-Tech" business plan).)

15.  Carlson and Compak discussed several "areas of cooperation" during the first four months of 2001.  (PX 86.)  Among other proposals, the parties discussed: (a) retaining Duo-Tech to manufacture Compak's communion-cup product; and (b) licensing

Compak's patents to Duo-Tech to develop non-religious uses for the patented container. (<u>Id.</u>; <u>see also</u> PX 78 at DUO00451-53 (describing existing and potential uses for the container).) Among the products that Duo-Tech was interested in pursuing was a "12-Hour Mouthwash." (PX 78 at DUO00452.)

16.    Compak was having substantial financial difficulty in May 2001, and Carlson's contemporaneous emails and faxes confirm that he was aware of that fact.

17.    Carlson executed a confidentiality agreement with Compak on May 11, 2001. (PX 33.)

18.    On June 8, 2001 Compak and "Duo-Tech" executed a "Memorandum of Understanding" giving Duo-Tech, in exchange for "value received of $1.00," "non-exclusive rights . . . to market, sell, manufacture, and distribute all products" utilizing the '106, '351, '388, and '312 patents. (PX 34.) The parties executed an "Addendum" on June 14, 2001 that modified the agreement to, among other things, expressly bind Compak, Duo-Tech, and their "assigns or successors." (PX 35.)

19.    While Carlson was negotiating with Compak, he was also trying to forge a relationship with Olmarc and its principal, Ken Marchetti. On June 27, 2001 Carlson sent Marchetti a fax disparaging Compak's business — "they (individually or as a group) are not competent enough to make a success of the unique and exciting profitable process they have available for the world" — and declaring the company insolvent. (PX 38 at DUO003929 ("they [Compak] are so mired in debt (and even their internal, unaudited financial statements show this) that they can do nothing except fail.").)

20.   On July 10, 2001 Duo-Tech and Compak executed an agreement superceding the parties' June agreement.   (PX 159 (the "July License Agreement.").)  The agreement contained a table listing a specific royalty fee per unit sold for each of two product categories ("A" ("[f]ood-related products") and "B" ("[a]ll other products")), and then a separate "Communion Cup Royalty Rate."  The Communion Cup Royalty rate was a percentage of "Gross Profit" for each communion-cup sold: 35% in 2001, and then decreasing 5% each year until 2005.   (Id. at § 4.)   The agreement defined "Gross Profit" as "the difference between the Cost of Manufacturing and the Net Sale Price."   (Id.)   (Although the terms "Cost of Manufacturing" and "Net Sale Price" were capitalized, they were not defined.) The last column of the table is labeled "Minimum Royalty Fee Due Annually**," and shows increasing minimums over time: $0 in 2001, $500,000 in 2002, $750,000 in 2003, $1,000,000 in 2004, and $1,500,000 in 2005 and every year thereafter for the life of the patents.   (Id.)   The asterisks refer to the following language: "Annual payment must not be less than this amount regardless of units sold." (Id.)   In addition, Compak "designate[d] Duo-Tech as a manufacturing agent of Compak for Communion Cups." (Id. at § 6.) Compak agreed to "provide the machinery," and Duo-Tech agreed to "pay for manufacturing runs," invoice customers, and collect payments.   (Id.)   Duo-Tech would then pay Compak "the difference between the cost of the manufactured product and the collected charge to the customer," less an unspecified "administration and inventory transaction fee" not to "exceed ten percent of the cost of the manufactured products sold."   (Id.)   Section 6 further provided that "Duo-Tech will have the right to manufacture its own products, using Compak's machinery, but must give priority in the manufacturing schedule to Compak's orders."   (Id.) Johnson and Carlson executed the agreement, on behalf of Compak and Duo-Tech, respectively, below the following language: "this Agreement becomes

a complete and binding Contract upon its acceptance as signified by the signatures below, whether made in person or by facsimile, on this day of July 10, 2001." (Id. at p. 2.)

21.   Carlson incorporated defendant Duo Tech Holdings, Inc. on July 23, 2001.  (PX 158.)

22.   In or before July 2001 Carlson attempted to obtain a license from Oxyfresh Worldwide, Inc. ("Oxyfresh"), the company that owned the patent that Duo-Tech intended to utilize for its proposed mouth rinse product.  (PX 96.)

23.   Carlson proposed to Compak a substantially revised license in August 2001, ostensibly to assuage concerns that Oxyfresh had raised about the July License Agreement.  (See PX 36 (email stating that Oxyfresh and other potential partners "need to see real legalese.").)

24.   On August 21, 2001 Carlson faxed to Compak a draft of a proposed license agreement between Compak and Duo Tech Holdings, prepared by Duo Tech's counsel. (PX 41; see also PX 42 (email dated August 21, 2001 from Carlson's attorney to Carlson attaching a file named "License Agreement - Final.PDF," which appears to be the same agreement that Carlson faxed to Compak).)

25.   The new proposed agreement abandoned the July License Agreement's "manufacturing agent" provision: Duo Tech Holdings would have no obligation to manufacture products for Compak, nor any right to use the CP-11 machine for its own products.  Royalties for all products utilizing the patents would be calculated in the same manner, as a percentage of "Net Income" — 35% for exclusive products and 25% for non-exclusive products.  The "Minimum Royalty Fee Due Annually" was replaced by a "Royalty Threshold:" $250,000 from the date of execution through the end of 2002, $500,000 for

2003, $750,000 for 2004, and $1 million for each year thereafter. If DuoTech failed to meet the Royalty Threshold in a given year, Compak would have the right to terminate the license (subject to DuoTech's right to make up the royalty shortfall by April 1 of the subsequent year).

26. On August 28, 2001 Duo Tech Holdings' attorney sent Ron Bowen a document showing changes to the draft that Duo Tech had circulated a week earlier. Johnson and PatPak Corporation, ostensibly the licensee of the '351, '388, and '312 patents, were added as parties. The draft also curtailed the scope of Duo Tech's right to designate products "exclusive" by excluding communion cup products. Most significantly, from TCC's perspective, the royalty calculation was revised substantially: instead of 25% (non-exclusive) or 35% (exclusive) of Net Income, the revised draft provided for 3% (non-exclusive) or 7% (exclusive) of "Gross Income," with no "Royalty Thresholds."

27. On August 29, 2001 Carlson (signing on behalf of Duo Tech Holdings) and Johnson (signing on his own behalf and on behalf of Compak and PatPak) executed the revised license agreement. (DX 22 (the "August License Agreement").)[2]

28. DuoTech Holdings did not manufacture or sell any products utilizing the licensed patents in 2001 or 2002.

29. In June 2002 Compak filed for bankruptcy. Compak's wholly-owned subsidiary, Communion Packaging Company ("CPC"), filed several months later. The bankruptcy court consolidated the two

---

[2] Jimmy Johnson testified that he relied on Ron Bowen's representation that the final agreement contained substantially higher royalty percentages and a minimum royalty requirement. Even if we thought that Mr. Johnson's testimony was credible — and we do not — it is irrelevant. Before trial TCC expressly stated that it was not pursuing a claim against the defendants based on actual fraud, and reaffirmed its choice during its closing argument.

cases.

30.    Carlson knew that Compak had declared bankruptcy, was aware of its reorganization plan, and at least initially monitored events in the bankruptcy proceeding.  (See PX 49 and PX 51.)

31.    Throughout 2002, while Bowen was still Compak's president, he was also working for Carlson.  (See PX 51 (Carlson email to Marchetti, dated July 29, 2002, stating that Bowen "is a member of our Team and a friend"); see also id. ("We need some answers and we need to get them before we continue to allow Ron to represent us.").)  Other documents indicate that Bowen held, or else it was contemplated that he would hold, high-level positions at one or more Duo Tech entities.  (See PX 57 (an undated document purporting to show that Bowen owned a stake in an unspecified "Holding Company" and "LLC," and identifying Bowen as the "President" of the "LLC."); PX 50 (email from Carlson to "Kim," dated September 11, 2002, attaching a document entitled "Who DuoTech Is," which lists Ron Bowen as the "President of Compak and the DuoTech COO").)[3]

32.    Carlson purported to sever ties with Bowen in August 2002.  (See PX 58 (email from Carlson to Bowen, dated August 15, 2002).)  But he continued to hold Bowen out as a Duo Tech executive, and continued to communicate with him about the company, after that date.  (See PX 50 (identifying Bowen as "DuoTech COO" on September 11, 2002); PX 52 (identifying Bowen as "President of DuoTech" on November 27, 2002); PX 119 (December 18, 2002 email asking Judy Smith, an individual Carlson identified as Bowen's secretary, to

---

[3]    Whether the terms "Holding Company" and "DuoTech" refer to DuoTech Holdings — the company that licensed Compak's dual-lid patents — is unclear. Carlson testified that these were different companies formed to utilize different intellectual property to make different products.  We have our doubts about Carlson's credibility generally, but his testimony on these matters is not implausible and there is no evidence in the record contradicting it.  Carlson's correspondence discloses several witnesses who may have relevant information, but TCC only called Carlson to testify and did not depose anyone.

deliver a message to Bowen imploring him to play a more active role in "DuoTech"); see also PX 82 (July 26, 2003 email from Carlson to Bowen and others at "duotech.biz" email addresses).)

33.    On February 11, 2003 Compak and CPC filed a "Motion to Set Bid Procedures for Sale of Business Property Pursuant to Sec. 363 of the U.S. Bankruptcy Code," attaching an unexecuted Asset Purchase Agreement between the debtors and a stalking-horse bidder, Nationwide Truck Lines.  (PX 112.)  The proposed purchase price was $750,000 for the "Compak Assets," a term defined to include (among other things) the '106 patent, as well as "all of Compak's right, title and interest in and under all Leases, Contracts and Permits, which are being assigned to and assumed by Purchaser." (Id.)

34.    On February 25, 2003 the bankruptcy court entered an order establishing bid procedures for the § 363 sale.  (PX 54.)  The order attached a list of the debtors' assets, which interested parties could bid for by individual lot or in total.  (Id. at ¶ 2, Ex. A.)  Those assets included the '106 patent, "[c]ontracts rights, if any," "[l]icensing agreements, including PatPak, Inc.," and "[a]ny and all other identifiable assets."  (Id. at Ex. A.)

35.    On March 5, 2003, the debtors filed a motion to sell their assets "free and clear of liens and encumbrances in accordance with [the Nationwide Truck Lines agreement] or for such other bid as is submitted" at the § 363 sale hearing.  (PX 55.)

36.    On March 18, 2003, in response to a motion that Klockner had filed, the bankruptcy court clarified that the CP-11 machine was not part of the debtors' estate and therefore not for sale at the § 363 hearing.  Prior to the sale hearing, which was conducted on March 19, 2003, Nationwide Truck Lines withdrew its bid.  (PX 114 (Transcript of Proceedings of 363 Sale) at 5.)

37.   There were lengthy discussions at the sale hearing about what patents Compak did or did not own, with unhelpful and confusing commentary by Jimmie Johnson.  (Id. at 23-28, 31-36.)  It is clear, however, that Johnson believed at that time that Compak did not own the '312, 351, and '388 patents.

38.   BMJ's $180,000 bid for all the debtors' assets was the highest bid received at the hearing.  (Id. at 48-49.)

39.   McClandon testified that at the sale hearing she and her attorney spoke with an attorney for Klockner and expressed interest in purchasing the CP-11 machine.  According to McClandon, Klockner's attorney told her that Klockner would sell the machine for $150,000.

40.   On March 25, 2003, the bankruptcy court entered an order approving the sale of the debtors' "Business Assets" to BMJ "free and clear of all liens, claims, encumbrances and interests, including rights of set off and recoupment."  (PX 59 at ¶ G.)  The order defined "Business Assets" as "substantially all of [the debtors'] business real and personal property, excluding bankruptcy causes of action and related claims and cash."  (Id. at ¶ 6.)

41.   On March 25, 2003 Compak, CPC, and BMJ executed an Assignment of Patent Rights, transferring to BMJ all of the debtors' right, title, and interest in the '106 patent, certain foreign patent applications, and "a proposed U.S. Patent Application for multi-compartment packaging (Docket C-285)."

42.   On March 26, 2003 Jimmie Johnson executed a "Bill of Sale," transferring to BMJ "all of Seller's right, title and interest in and to all of the personal property of the Seller, tangible and intangible, wherever located, including without limitation all of Seller's business as a going concern, goodwill, choses in action,"

etc. (PX 60 at DUO003132.)

43. BMJ carried on Compak's former business immediately after the sale, and for a short period of time thereafter, before assigning Compak's assets to the newly-formed TCC.

44. McClandon retained Bowen as a consultant after the sale, and in that capacity he continued to handle day-to-day operations, as he had during Compak's bankruptcy. (See PX 146 (fax from Bowen to BMJ's payroll person regarding payments in connection with his "temporary consulting contract"); see also PX 144, 145, 150, 151, 153, 154 (reports submitted by Bowen to McClandon concerning customer payments and related issues).) Bowen's agreement with BMJ did not have a specific termination date.

45. Bowen did not disclose that he was affiliated with Carlson, nor was McClandon aware of the August License Agreement.

46. Olmarc orally agreed to perform for BMJ/TCC the same services it performed for Compak prior to, and during, Compak's bankruptcy. The general terms of that arrangement were set forth in an unexecuted Memorandum of Understanding between Olmarc and CPC. (PX 143.)

47. Without paying or executing any agreement with Klockner, BMJ/TCC directed Olmarc to manufacture communion cups using the CP-11 machine. Olmarc began manufacturing communion cups for BMJ/TCC in or around April 2003.

48. Sometime in or around May 2003 Korber Medipak purchased Klockner.

49. McClandon testified she was actively attempting to purchase the CP-11 machine in April and May 2003. Although we generally

found McClandon to be a credible witness, we are not persuaded that she pursued the CP-11 machine as urgently as her testimony suggested. She testified that in May 2003 Marchetti effectively sabotaged her negotiations with Klockner by asserting a lien against the machine. Even accepting that premise, it is not clear why TCC failed to purchase the machine in April 2003. McClandon testified that her attorney at that time, Russell Green, handled the negotiations with Klockner. But TCC did not call him to testify.

50. Carlson testified that he first learned of the bankruptcy sale in mid-July 2003, when, over lunch with Ken Marchetti, he asked: "whatever happened to that communion company [i.e., Compak]?" We have significant doubts about this testimony. Bowen and Marchetti — members of Carlson's self-described "team" — had been working with BMJ/TCC for nearly four months at that point: Bowen was serving as BMJ's/TCC's consultant, and Marchetti was manufacturing communion cups for BMJ/TCC. Carlson further testified that Marchetti told him that the person or entity that purchased Compak's assets — Carlson could not recall if Marchetti had mentioned McClandon by name — was not using the CP-11 machine. Marchetti had no reason to lie to Carlson about the work he was performing for BMJ/TCC using the CP-11 machine.

51. According to Carlson, he contacted Klockner on the same day that he learned from Marchetti that Compak had sold its assets. Carlson was put in touch with Matthias Otto, who had recently joined Klockner after the sale to Korber. Carlson offered him $150,000 for the machine. On July 25, 2003, Klockner and Carlson executed an option agreement to purchase the machine for $150,000 on or before August 29, 2003. (DX 5.)

52. After executing the agreement Otto and Carlson agreed that the

machine should be shut down for inspection, and to insure that the machine was not damaged before Carlson paid Klockner.  (See DX 21 at BMJ 03122.)

53.  McClandon learned from Marchetti that Carlson had purchased the machine.  At Marchetti's suggestion, McClandon contacted Carlson.  Both Carlson and McClandon testified that this initial conversation was cordial, although they disagree about the substance of what was said.  Regardless, the relationship quickly soured after Carlson learned that McClandon had contacted Otto. Carlson left McClandon a voice mail message in which he told her that she could not use the machine and would "never" make communion-cups again.

54.  McClandon notified TCC's customers, UMI and Lifeway, that someone else had claimed an interest in the machine and that TCC intended to fill existing orders with the completed cups it had in stock.  Olmarc refused to ship the products.

55.  Carlson also contacted UMI and Lifeway, and persuaded them to do business with Duo Tech.  Carlson's correspondence with Lifeway contains some arguably improper statements about McClandon and TCC, and a statement that TCC regards as indicating that Marchetti and/or Bowen were disclosing information about TCC to Carlson. (See PX 65 (August 13, 2003 email to Lifeway) and PX 68 (August 12, 2003 email to Lifeway).)

56.  Olmarc paid the $150,000 purchase price to Korber, on Carlson's behalf, before the option expired on August 29, 2003.

57.  On September 17, 2003, Carlson executed an agreement purporting to sell the machine to DuoTech Packaging in exchange for $150,000 payable to Olmarc.  (DX 4 at § 2.)  Carlson testified that

he purchased it back from DuoTech Packaging, and resold it to his son-in-law, Rick Alverado, sometime before the end of 2003. Alverado has owned the machine since that time, and leases the machine to defendant DuoTech Packaging, LLC (an affiliate of DuoTech Holdings).

58. On September 9, 2003, DuoTech Packaging filed an adversary complaint in the bankruptcy court asking the court to declare who owned the licensor's rights under the August License Agreement and requesting leave to deposit anticipated royalty payments with the clerk of the court pending the court's ruling. The complaint named Compak, its bankruptcy trustee, BMJ, PatPak, and Jimmie Johnson as defendants.

59. Sometime in the fall of 2003 Olmarc began manufacturing communion cups for Duo Tech Packaging using the CP-11 machine.

60. Compak filed this lawsuit on October 21, 2003.

61. After discussions with several vendors in the fall and winter of 2003, TCC ordered a machine in January 2004 from a German company, Hassia.

62. Duo Tech began selling "generic" communion cups to UMI sometime in 2003. There was some suggestion during the testimony of Harriet Barry, Communion Source's general manager at that time, that DuoTech may have sold existing Celebration Cup inventory to UMI in 2003. (Cf. supra, ¶ 54.) But her recollection was not sufficiently clear to establish that fact.

63. DuoTech Packaging filed its first "Quarterly Royalty Statement" with the clerk of the bankruptcy court on October 29, 2004. DuoTech Packaging, LLC v. Leibowitz, Adversary Proc. No. 03 A 3898 (Bankr. N.D. Ill. 2003) (Quarterly Royalty Statement (DKT #

26)).

64.   On November 1, 2005, BMJ's counsel sent a letter to DuoTech's counsel demanding an accounting "[p]ursuant to § 4(b) of the purported license" (i.e., the August License Agreement).  (PX 102.) Whether there was any further correspondence between BMJ's counsel and DuoTech's counsel is unclear (the lawyers representing the parties at trial did not represent the parties in 2005).  But it is clear that DuoTech did not comply with the request.

65.   In April 2006, UMI sold its Communion Source division to Communion, LLC.  (PX 157.)  Communion, LLC was formed specifically to purchase Communion Source and is owned (according to Carlson) by his children, his son-in-law (Rick Alverado), and others.  Carlson signed the Asset Purchase Agreement on Communion, LLC's behalf as its "manager," and on DuoTech Packaging's behalf with respect to a provision terminating a "DuoTech Packaging Distributor Agreement" between DuoTech Packaging  and UMI.  (Id. at § 1(d), 12-13.) Carlson also signed on his own behalf as the guarantor of Communion, LLC's obligations under a promissory note that it executed as part of the sale.  (Id. at ¶ 2(b), 13.)  DuoTech Packaging made the payment that Communion, LLC owed at closing with a check signed by Carlson.

66.   As part of the sale Communion, LLC acquired the domain names "communionsource.com" and "celebrationcup.com."  (Id. at Schedule 1(a)(4).)

67.   Between 2006 and 2008 Duo Tech Packaging sold communion cups to Communion, LLC.  After initially denying that he knew what Communion, LLC did with the purchased cups — an incredible statement — Carlson effectively admitted that he knew that the company resold them.

68.    TCC's new communion-cup machine was finally installed and ready to begin production sometime in 2006.  The total cost of the machine was approximately $3 million.  While TCC was unable to manufacture communion cups between July 2003 and sometime in 2006, due to the lack of a machine, it did do some limited advertising during this time period.  It also registered the trademark "Celebration Cup."  After 2006, TCC spent significantly more money promoting the Celebration Cup in print ads, on the Internet, on television, and at trade conventions.  However, none of the Celebration Cup promotional materials that TCC introduced at trial contained an "®" or otherwise indicated that "Celebration Cup" was a registered trademark.

69.    In or around August 2007 Carlson removed the CP-11 machine from Olmarc's premises because Olmarc was having financial problems.  Carlson testified at length concerning technical problems with raw materials, and with the machine itself, after he removed the machine.  His testimony was essentially unrebutted.

70.    On November 29, 2007, the bankruptcy court approved a settlement between the DuoTech defendants and the trustees of the Compak and Johnson bankruptcy estates pursuant to which the defendants acquired any rights the trustees had, may have had, or claimed to have in the '351, '388, and '312 patents.  (DX 1.)  The defendants outbid TCC for those rights.

71.    DuoTech Packaging last deposited royalty payments with the clerk of the bankruptcy court on November 4, 2008.  That deposit represented royalties for sales during the fourth quarter of 2007 and the first quarter of 2008.  Carlson testified that he stopped paying royalties because he has been unable to manufacture merchantable communion cups since the first quarter of 2008 and has not made any communion-cup sales since that time.

72.   Cavanaugh Company, one of Duo Tech Packaging's raw-material vendors, shipped 19,980,000 communion wafers to "DuoTech, LLC" in 2008.  (PX 178.)  It shipped 1,065,000 wafers in 2009, and 900,000 wafers in 2010, some or all of which were sent to an entity called Kingdom Minded.  (Id.)  According to Carlson, Kingdom Minded was slated to take over communion-cup manufacturing in 2009 and has spent "a lot of money" trying to repair the CP-11 machine.  Rick Alverado, Carlson's son-in-law, is affiliated with Kingdom Minded.

73.   Cavanaugh Company double-billed Kingdom Minded for new wafer purchases in 2009 and applied the payments to DuoTech's outstanding balance.

74.   Communion, LLC was involuntarily dissolved by the Illinois Secretary of State in September 2008, and reformed ten days later under the same name.  (PX 158.) Carlson testified that he is not the manager of the "new" Communion, LLC, which was itself involuntarily dissolved in March 2010.  The Illinois Secretary of State's office indicates that Communion, LLC and DuoTech Packaging had or have the same "principal office" and the same registered agent, Andrew J. Cohen.  Mr. Cohen is also the registered agent of Kingdom Minded, Inc., and one of the two attorneys who represented Carlson at trial.  According to Carlson, his children and his son-in-law still own Communion, LLC.

75.   Sometime in early 2009 Robert Johnson, McClandon's son and TCC's CEO, attempted to register the domain name "celebrationcup.com."  He then learned that Communion Source had already registered that domain name.  When he entered "www.celebrationcup.com" into the address bar of his Internet browser he was automatically and seamlessly redirected to "www.communionsource.com."  That website purported to offer the

Chasid Cup for sale.

76.    Robert Johnson testified that the Internet screenshots identified as PX 105, which McClandon printed in February 2011, essentially depict the website he saw in 2009.  The website states, "We are the exclusive distributors of Chasid Cup®, Pre-filled Communion Cups and Wafers.  Often compared to, Remembrance® Cup and/or Celebration Cup®."  (PX 105.)  And under the heading "News," the following statement appears: "**04.17.09** *Chasid Cups are backordered*.  Our manufacturer is executing their yearly maintenance on their machine.  Also, Easter has depleted our stock.  We look forward to getting more Chasid Cups within 2-3 weeks."  (Id. (emphasis in original).)

77.    Carlson's representation that there have not been any "Royalty Sales" since the first quarter of 2008 is suspicious in light of: (1) sheer number of communion wafers that Duo Tech and Kingdom Minded purchased between 2008 and 2010; (2) Carlson's disingenuous attempts to disassociate himself from Kingdom Minded and Communion, LLC; and (3) the statements on communionsource.com.  Moreover, it is difficult to understand why Lifeway — Duo Tech's other customer besides the family-owned Communion, LLC — would be willing to wait out the defendants' manufacturing troubles.  By Carlson's estimate, Lifeway's patience has cost it millions of dollars. These reservations about Carlson's testimony raise the possibility that in fact there were royalty sales during the period in question.  But they do not carry the day for the plaintiff by proving that there were such sales.  This was the plaintiff's burden.  Carlson testified unequivocally that there were no royalty sales, and plaintiff has failed to establish that there were.  If in fact Lifeway did receive shipments of merchantable cups, plaintiff should have been able to prove that by calling witnesses from Lifeway.  As far as Carlson's testimony about the need to use

millions of wafers in unsuccessful attempts to make the machine operate properly, plaintiff offered only the testimony of Jimmie Johnson that, during the time he was familiar with the machine, the machine <u>could</u> make sealed cups without a wafer. But that testimony does not establish that Carlson, five years later, was not using wafers during machine testing and maintenance without producing any merchantable cups.

As the defendants pointed out, a complete saleable communion-cup requires not only wafers but <u>juice</u>. Carlson testified without contradiction that during the relevant time period he did not order, or have on hand, a substantial amount of juice. Plaintiff did not prove any deliveries of juice to the defendant during the relevant time and, without that proof, the substantial deliveries of wafers are not probative. In fact, taking Carlson's testimony at face value, the lack of juice corroborates his testimony that the wafers were not used to make saleable cups.

<strong><u>Conclusions of Law</u></strong>

**A. Count I (Constructive Trust) and Count II (Patent Infringement)**

On June 1, 2009 we granted the defendants' motion for summary judgment on Counts I and II of TCC's original complaint. TCC repled those claims in its Amended Complaint, presumably to preserve its appeal rights. During the trial we heard evidence relevant to certain findings that we made in our earlier decision, but nothing that would warrant a different outcome. TCC indicated before trial that it might move for reconsideration, but it has not filed such a motion and it did not discuss Counts I and II in its closing argument. We will not revisit our earlier rulings under these circumstances. <u>See</u> <u>Santamarina v. Sears, Roebuck & Co.</u>, 466

F.3d 570, 572 (7th Cir. 2006) (The law of the case doctrine
authorizes reconsideration "if there is a compelling reason, such
as a change in, or clarification of, law that makes clear that the
earlier ruling was erroneous.").

**B.    Count III (Breach of Contract Against Olmarc)**

Olmarc filed a notice of assignment for the benefit of
creditors on October 17, 2008.  So, not surprisingly, Olmarc did
not respond to the Amended Complaint that TCC filed a year and a
half later.   TCC, which never formally moved for an order of
default, stated during opening statements that the trial would
serve as a prove-up hearing with respect to Olmarc and Ron Bowen,
another absent defendant.  McClandon testified that Olmarc agreed
to continue providing services to TCC on terms comparable to those
that had governed Olmarc's relationship with Compak.   But the
parties never executed a written agreement, nor was there any
evidence that Olmarc orally agreed to provide services for a
specific time period.  See Mid-West Energy Consultants, Inc. v.
Covenant Home, Inc., 815 N.E.2d 911, 915 (Ill. App. 2004) ("A
contract of indefinite duration such as the one here is not deemed
perpetual and, thus, is terminable at will.").  TCC has failed to
show that Olmarc breached the parties' oral agreement when it
stopped working for TCC and started working for the defendants.
TCC's Amended Complaint also alleges that Olmarc improperly
withheld reserve-account funds and raw materials when the parties

ended their relationship.  McClandon alluded to this dispute during her testimony, but she did not (nor did anybody else) testify concerning: (1) the total amount of money that Olmarc was withholding at that time (in or around July/August 2003); and (2) what raw materials Olmarc allegedly refused to turn over.  Olmarc's inventory of *finished* products received more attention during the trial, (<u>see, e.g.</u>, PX 141), but not in connection with TCC's claims against Olmarc.  Whether TCC had a claim to those products superior to Olmarc's is unclear.  TCC has not proven Olmarc's liability or any damages caused by its conduct.  Indeed, TCC effectively abandoned its claims against Olmarc (including its claim for tortious interference) in its closing argument.

## C.   Count IV (Tortious Interference with Contract and Prospective Economic Advantage)

Although Count IV is styled as tortious interference with contract <u>and</u> prospective economic advantage, TCC has effectively abandoned the former claim.[4]  The elements of tortious interference with prospective economic advantage are: "(1) plaintiff must have a reasonable expectation of entering a valid business relationship; (2) defendant must purposely interfere and defeat this legitimate expectancy; and (3) defendant's actions must cause harm to plaintiff."  <u>A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.</u>, 956

---

[4]  Defendants devoted a substantial portion of their closing argument to attacking TCC's claim for tortious interference with contract.  But it was apparent from TCC's closing argument that it was no longer pursing that claim.

F.2d 1399, 1404 (7th Cir. 1992) (citation and internal quotation marks omitted). Courts sometimes add, as a distinct element, "the defendant's knowledge of the plaintiff's expectancy." Botvinick v. Rush University Medical Center, 574 F.3d 414, 417 (7th Cir. 2009).

During closing arguments TCC argued that it reasonably expected to continue its business relationships with UMI and Lifeway.[5] "A 'reasonable expectation' requires more than the hope or opportunity of a future business relationship." Business Systems Engineering, Inc. v. International Business Machines, Corp., 520 F.Supp.2d 1012, 1022 (N.D. Ill. 2007) (citing Anderson v. Vanden Dorpel, 667 N.E.2d 1296, 1300 (1996)). UMI and Lifeway were Compak customers who continued purchasing communion cups from TCC after the bankruptcy sale. It was reasonable for TCC to expect that this would continue. Until Carlson purchased the machine, TCC was the only source for the product. It is true that TCC was operating under a cloud during the first four months after the bankruptcy sale. Olmarc had agreed to operate the CP-11 machine to manufacture products for TCC, but Klockner owned the machine before and after the bankruptcy sale. TCC took a substantial risk

---

[5] Defendants dismissed this argument as "new" during their closing argument. It is true that TCC did not expressly articulate this theory in its complaint, which focused primarily on TCC's relationship with Olmarc. (Am. Compl. ¶ 71 ("DuoTech persuaded Olmarc to cease manufacturing Cups for TCC, and to instead manufacture Cups for DuoTech exclusively.").) But TCC's tortious interference claim, as pled in the complaint, is at least implicitly based on its inability to sell products to its customers. (Id. at ¶ 103 ("As a direct and proximate result of these defendants' conduct, TCC was injured, suffering lost sales and profits and damage to its goodwill during its critical start-up phase.").)

operating the business without purchasing the machine outright, or else entering into a formal agreement with Klockner to use it. It seems likely that TCC and Klockner would have worked something out but for Carlson's appearance on the scene. TCC needed the machine, and Klockner wanted to sell it.

Carlson was aware of TCC's expectancy, see supra ¶ 55, and plainly interfered with it: he contacted TCC's customers and persuaded them to do business with DuoTech rather than TCC. "[A] plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful interference' — that the defendant has committed some impropriety in doing so." Dowd & Dowd, Ltd. v. Gleason, 693 N.E.2d 358, 371 (Ill. 1998) (citing Restatement (Second) of Torts § 766B, cmt. a (1979)). The element of purposeful interference overlaps what is sometimes called the "competitor's privilege," A-Abart, 956 F.2d at 1405, a term that creates confusion about which party has the burden of proof. See, e.g., Cromeens, Holloman, Sibert, Inc v. AB Volvo, 349 F.3d 376, 398-99 (7th Cir. 2003); see also Restatement (Second) of Torts § 768(1) ("Competition as Proper or Improper Interference").[6] But whether we consider the propriety of

---

[6] The Restatement itself expressly declines to decide who has the burden of proof. See Restatement (Second) of Torts § 768 cmt. a (1979) ("[T]his Section speaks of an interference that is improper or not, rather than of a specific privilege because there is no consensus that engaging in competition is an affirmative defense to be raised and proved by the defendant or is instead simply not improper conduct inconsistent with the American system of free enterprise.").

Carlson's actions as an element of TCC's claim or an affirmative defense, we are not persuaded that he acted improperly.

First, Carlson's comments in his correspondence with Lifeway do not add anything to TCC's claim, even assuming they were "improper." TCC could not produce communion cups once Carlson(with Klockner's blessing) ordered the machine shut down in July or August 2003, whether or not Lifeway credited Carlson's statements about McClandon. During closing arguments TCC effectively conceded that Carlson did not act improperly when he purchased the machine. It argued, however, that he improperly refused to share it. TCC cites <u>Fishman v. Wirtz</u>, Nos. 74 C 2814 and No. 78 C 3621, 1981 WL 2153 (N.D. Ill. Oct. 28, 1981) to supports its theory, a case which awarded damages for tortious interference with prospective economic advantage on loosely analogous facts. We will discuss instead our Court of Appeals' thorough decision affirming the district court in part and reversing it in part. <u>See</u> <u>Fishman v. Estate of Wirtz</u>, 807 F.2d 520 (7th Cir. 1986). In 1972 Chicago Professional Basketball Corporation ("Chicago Basketball") agreed to sell the Chicago Bulls to Illinois Basketball, Inc. ("IBI") for $3.25 million, subject to the NBA's approval. <u>Id.</u> at 526. At the same time, Chicago Basketball rejected a competing bid for the team from Chicago Professional Sports Corporation ("CSPC"). <u>Id.</u> Arthur Wirtz, a principal of Chicago Stadium Corporation ("CSC"), which owned Chicago Stadium, was also a principal of CSPC. <u>Id.</u> at 525. CSPC

refused to lease Chicago Stadium to IBI, and lobbied the NBA's Board of Governors to reject the sale to IBI on that basis. Id. at 527-28. CSPC succeeded: the Board of Governors rejected IBI's bid to acquire the Bulls and later approved a sale to CSPC. Id. at 529. The district court held that CSPC's actions violated the Sherman Antitrust Act, which formed the basis for its ruling that CSPC was liable for tortious interference with prospective economic advantage. Id. at 546; see also id. at 547 (defendants lost their "competitor's privilege" to interfere by resorting to means prohibited by the Sherman Act). Our Court of Appeals, with Judge Easterbrook dissenting, affirmed both rulings as to liability. Id. at 562.[7]

TCC argues that the CP-11 machine is analogous to Chicago Stadium, which our Court of Appeals concluded was an "essential facility." "The so-called 'essential facilities doctrine' imposes upon a firm controlling an essential facility — that is, a facility that cannot reasonably be duplicated and to which it is necessary if one wants to compete — the obligation to make the facility available to competitors on nondiscriminatory terms." Id. at 539. There are several problems with TCC's argument. First, the Fishman Court, including the dissent, exhaustively discussed Sherman Act precedent in reviewing the district court's rulings. That

---

[7] The portions of the district court's order that our Court of Appeals reversed are not directly relevant to this case.

discussion was integral to the Court's ruling that the defendants "competed unlawfully." Id. at 546-47. TCC did not allege a Sherman Act violation nor seek to prove one at trial, and only superficially addressed the subject in closing argument. Deciding complex questions of antitrust law on such a scant record is a recipe for error. But even without the benefit of a more complete record we conclude that Fishman is distinguishable. Both the majority and the dissent recognized that the essential facilities doctrine must have some limits, otherwise plaintiffs could piggyback on their competitors' efforts with no discernable benefit to competition or consumers. Relying on testimony that a new arena would have cost $19 million to construct, the Fishman Court concluded that "[t]he Chicago Stadium was not duplicable without an expenditure that would have been unreasonable in light of the size of the transaction such duplication would have facilitated." Fishman, 807 F.2d at 540; cf. id. at 574 (Easterbrook, J., dissenting) ("Antitrust law does not relieve each would-be competitor of the need to build its own production facilities, if the market will support more than one."). The $3 million TCC paid to build a new machine seems like an impressive figure, but there is no evidence in the record suggesting that TCC cannot recoup its investment. We assume the opposite is true: McClandon is plainly a sophisticated business person.

TCC also argues that, as parties to the same license

agreement, TCC and the defendants owed each other a duty of care that would not otherwise pertain to competitors.[8]  "The Illinois courts have stated that every contract implies good faith and fair dealing between the parties to it.  However, under Illinois law, the covenant of good faith and fair dealing has never been an independent source of duties for parties to a contract . . . . Instead, the covenant guides the construction of explicit terms in an agreement."  Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir. 1992) (citations omitted); see also id. at 1445 ("[T]he implied covenant of good faith and fair dealing does not create 'an enforceable legal duty to be nice or to behave decently in a general way.")(quoting Zick v. Verson Allsteel Press Co., 623 F.Supp. 927, 929 (N.D. Ill. 1985)).  The exclusive license agreement in Beraha did not explicitly require the licensee to develop a product using the licensed invention, or "to exert any specified level of effort" towards that end.  Id. at 1441.  The Beraha court, construing Illinois law, concluded that the implied covenant of good faith and fair dealing required the licensee "to exercise the discretion afforded to it by the license agreement in a manner consistent with the reasonable expectation of the parties."  Id. at 1445.  It then remanded the case for the fact-finder to make that determination.  Id. ("The jury should be

---

[8]/  We will assume for sake of this discussion that it is appropriate to judge Carlson's actions against the standard imposed by the covenant of good faith and fair dealing, even though it was far from clear in 2003 that TCC and DuoTech Holdings were parties to the same agreement.

allowed to hear the evidence regarding what Baxter did to develop the Beraha needle and then determine if Baxter reasonably exercised its discretion under the circumstances and in light of the reasonable expectations of the parties."). There is no provision in the August License Agreement dealing with the CP-11 machine, and therefore no provision we can construe to require the defendants to share it.

Defendants are entitled to judgment on Count IV of TCC's Amended Complaint.[9]

## D. Count V (Requesting a Declaratory Judgment that TCC Owns the '351, '388, and '312 Patents)

Before addressing the parties' arguments we will briefly discuss Count V's unusual procedural history. In Count I of its original complaint TCC asked us to impose a constructive trust requiring Johnson and/or the other defendants to transfer to TCC "legal title" to the Subsequent Patents. Count II alleged that the defendants were infringing those same patents. We granted the defendants' motion to refer Counts I and II to the bankruptcy court because we concluded that they were "related to" Compak's

---

[9] TCC also named Ron Bowen as a defendant in Count IV. Bowen last appeared in this case in March 2006. At that time the bankruptcy court vacated the order of default that it had entered against him. When TCC filed its Amended Complaint four years later, it served Bowen's former attorney, who had withdrawn as his counsel in March 2004. We have serious doubts about whether this was valid service of process. Regardless, TCC did not prove Bowen's liability or any damages caused by his conduct. TCC's suspicion that Bowen may have disclosed information about TCC's business to Carlson is insufficient. TCC's theory of its damages for tortious interference — claiming that it is entitled to an additional 4% royalty on reported sales because the defendants "gave themselves" an exclusive license — is dubious even as applied to the DuoTech defendants. It is nonsensical as applied to Bowen.

bankruptcy.  See The Compak Co., LLC v. Johnson, No. 03 C 7427,
2004 WL 2034083, *3 (N.D. Ill. Sept. 2, 2004).  We received the
bankruptcy court's proposed findings of fact and conclusions of law
approximately four years later.  The Compak Co. v. Johnson, Case
No. 08 C 4665 (N.D. Ill. 2008) (Findings of Fact and Conclusions of
Law, filed Aug. 15, 2008, DKT #1).  With respect to Count I, the
bankruptcy court concluded that "[t]he imposition of a constructive
trust to transfer legal title to the plaintiff is needless because
Compak, had, and continues to have, legal title to the patents."
Id. at Conclusions of Law (Count I) ¶ 3.  As TCC pointed out, this
was a puzzling conclusion: if Compak (the bankruptcy debtor) held
the patents, then a constructive trust was not "needless" from
TCC's perspective.  We remanded the case to the bankruptcy court
"to clarify which party it believes currently owns the patents and
why."  (Minute Entry, dated November 25, 2008, DKT #84.)  On
remand, the bankruptcy court revised its conclusion to state that
a constructive trust was unnecessary because "none of the
defendants ever had legal title to the patents before the
bankruptcies were filed."  The Compak Co., Case No. 08 C 4665
(Supplement to Order, filed May 6, 2009, DKT #7, at 2).  In lieu of
answering the question that we posed in our order, which the
bankruptcy court deemed inessential to its ruling, the court
referred us to its order approving the bankruptcy trustees' sale to
DuoTech.  (Id.)  As we noted in our June 1, 2009 opinion, the

bankruptcy court's order did not resolve what property (if any) the bankruptcy trustees still owned. The Compak Co., LLC v. Johnson, 415 B.R. 334, 345 (N.D. Ill. 2009). At the same time, we expressed our expectation that the bankruptcy court would resolve the matter in the still pending interpleader action. Id. When that did not happen, TCC amended it complaint in this case to request a declaratory judgment that it owned the Subsequent Patents. The defendants did not move to refer Count V to the bankruptcy court, did not object when TCC asked us to confirm that the referral to the bankruptcy court had been withdrawn, and litigated the ownership question at trial. We conclude, then, that Count V is properly before us.

We previously concluded that the Subsequent Patents were related to Johnson's original invention within the meaning of the 1992 Bill of Sale. Id. at 344. Those patents were assigned by operation of law to Compak as the USPTO issued them, meaning that: (1) Johnson's purported assignment to PatPak was a nullity; and (2) the Subsequent Patents were part of Compak's estate when it filed for bankruptcy. Id. at 344-45. Of course, at the time of the bankruptcy sale — six years before our ruling — the bidders were operating under the assumption that Compak did not own the Subsequent Patents. That was Compak's position at that time, as reflected in its motion to sell its property and in Johnson's statements at the sale hearing. Only the '106 patent was expressly

identified as being for sale, but that does not mean that it was the only patent sold. The assets listed in the bankruptcy court's order approving the bid procedures included a catch-all category, "[a]ny and all other identifiable assets." As Compak's counsel explained to the bidders at the sale hearing, "[a]ll of the assets means all of the assets." (PX 114 at 15.) The bankruptcy court's order approving the sale refers to "substantially all" of the debtors' assets, "excluding bankruptcy causes of action and related claims and cash." (PX 59 at ¶ 6.) Read in conjunction with the court's order approving bid procedures, we conclude that the word "substantially" does not exclude anything <u>besides</u> "bankruptcy causes of action and related claims and cash." Indeed, in another paragraph of its order the bankruptcy court noted that BMJ "bid at the auction for <u>all the assets</u> of the Debtors," and that its bid was the "highest and best bid with no other bidders offering to purchase <u>all the assets</u> for any greater amount." (PX 59 at ¶ 10 (emphasis added).) Consistent with the bankruptcy court's orders, Compak executed a bill of sale transferring its personal property to BMJ in the broadest possible terms. (PX 60.) The separate "Assignment of Patent Rights" that Johnson executed only refers to the '106 patent, but again, that is consistent with what the parties understood Compak owned at that time. (PX 61.) BMJ bought more than that.

Finally, we are not persuaded by defendants' argument that TCC

admitted that it did not own the patents by bidding in 2007 for whatever rights the trustees "may" have had or "claimed" to have. (DX 1.) Before our ruling today, it was unclear who owned the Subsequent Patents and the parties did well to hedge their bets. But they did so at the risk that the trustees did not own what they "claimed" to own. See, e.g., Matter of Chicago, Rock Island and Pacific R. Co., 865 F.2d 807, 811, 816 (7th Cir. 1988). We conclude that TCC is entitled to a declaratory judgment that it owns the Subsequent Patents.

**E.  Count VII (Fraudulent Conveyance)**

TCC argues that the August License Agreement constituted a fraudulent conveyance under 740 ILCS 160/5, which provides in pertinent part,

> **160/5.  Transfer  or  obligation  fraudulent  as  to creditor--Claim arising before or after transfer**
>
> § 5.  (a) A transfer made or obligation incurred by a debtor  is  fraudulent  as  to  a  creditor,  whether  the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> [. . .]
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) was engaged or was about to engage in a business or a  transaction  for  which  the  remaining  assets  of  the debtor  were  unreasonably  small  in  relation  to  the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5. Compak's trustee no longer has the exclusive right to pursue fraudulent-conveyance claims. <u>See</u> 11 U.S.C. § 546(a)(limiting the trustee's right to bring a claim under 11 U.S.C. § 544 to the earlier of two years from the date of filing or the termination of the bankruptcy case); <u>Klingman v. Levinson</u>, 158 B.R. 109, 113 (N.D. Ill. 1993) ("The trustee's exclusive right to maintain a fraudulent conveyance cause of action expires and creditors may step in (or resume actions) when the trustee no longer has a viable cause of action.").[10] Nevertheless, defendants argue that the bankruptcy court's sale order, which authorized the sale of Compak's assets "free and clear of liens, claims, encumbrances, and interests of any kind," extinguished BMJ's claim against the defendants. This is not an obvious application of that provision. <u>See, e.g.</u>, <u>Environmental Barrier Co., LLC v. Slurry Systems, Inc.</u>, No. 06 C 0212, 2006 WL 2853830, *11 (N.D. Ill. Sept. 29, 2006) ("[T]he purpose of the 'free and clear of claims' language in the Bankruptcy Court's Order is to permit an assignee to acquire an asset without being subject to pre-petition unsecured claims associated with that asset."). Defendants have not cited any relevant case law, or even the relevant section of the Bankruptcy Code. This argument is waived. <u>See</u> <u>United States v. Useni</u>, 516 F.3d 634, 658 (7th Cir. 2008) ("We have repeatedly

---

[10]/ Defendants have not objected to TCC's standing to pursue a claim that originally belonged to BMJ.

warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (citation and internal quotation marks omitted).

### 1.  Whether the July License Agreement Was Binding

TCC uses the July License Agreement as a baseline to establish what contract rights Compak gave up when it executed the August License Agreement.  See In re Joy Recovery Technology Corp., 286 B.R. 54, 75 (N.D. Ill. Bankr. 2002) (The reasonably-equivalent-value inquiry "focuses on what did the debtor give up and what did it receive that could benefit creditors.").  We previously held that the July License Agreement was binding, noting that "the document is complete on its face and expressly states that it 'becomes a complete and binding Contract upon its acceptance as signified by the signatures below.'"  Compak, 415 B.R. at 338. Defendants have not persuaded us to change our mind.  First, Carlson's testimony that he believed the agreement was non-binding is neither credible nor relevant.  See Hampton v. Ford Motor Co., 561 F.3d 709, 714 (7th Cir. 2009) ("Illinois follows the objective theory of intent, whereby the court looks first to the written agreement and not to the parties' subjective understandings."). Confining our inquiry to the contract itself, we do not read the capitalized but undefined terms to indicate that the parties did not intend to be bound, or else that the agreement is too vague to enforce.  "Cost of Manufacturing" is not a difficult concept to

understand and apply. (We note in this connection that the August License Agreement does not define "Person," "Control, "Controlling," or "Controlled," and yet no one has suggested that the agreement was provisional or unenforceably vague.) The parties' failure to specify an "administration and transaction fee" is a more substantive omission, but the agreement did indicate a range (capping the fee at "ten percent of the cost of the manufactured product sold"). If the August License Agreement had not superceded the July License Agreement, we do not believe that the lack of a specific administration/transaction fee would have prevented enforcement of the parties' express intent to be bound by the July License Agreement. Finally, we reject the defendants' contention that the July Agreement was not binding because DuoTech Holdings had not yet been formed. This argument is borderline frivolous. Carlson signed the July License Agreement in a corporate, rather than an individual, capacity. After Carlson formed DuoTech Holdings on July 23, 2001, he sought to renegotiate the July License Agreement to appease OxyFresh, eventually signing the August License Agreement in his capacity as DuoTech Holdings' president. (PX 36; DX 22.) By shopping the license around to other vendors, and renegotiating its terms, DuoTech Holdings ratified the contract. Tin Cup Pass Ltd. Partnership v. Daniels, 553 N.E.2d 82, 85 (Ill. App. 1990); see also 1A Fletcher Cyc. Corp. § 211 ("[U]nequivocal acts signifying that the contract has been

recognized as a corporate obligation will suffice" to bind the corporation) (collecting authorities).

**2. Reasonably Equivalent Value**

"The issue of whether a debtor received reasonable equivalent value is a question of fact that must be evaluated as of the date of the transaction." In re Joy Recovery, 286 B.R. at 75. "Unlike contract law, nominal consideration is inadequate to satisfy the reasonable equivalent value standard. Moreover, since the purpose of fraudulent conveyance law is to protect creditors, the determination of value is looked at from the vantage point of the debtor's creditors." Id. (citations omitted). During its closing argument TCC explicitly agreed with defendants' position that the July License Agreement's "Minimum Royalty Fee Due Annually" was not a minimum royalty guarantee. It emphasized instead the difference between the royalty rates in the two agreements. Under the July License Agreement, DuoTech Holdings agreed to pay a royalty of 35% of "Gross Profit" for communion-cup sales in 2001, and then decreasing percentages in subsequent years.[11] Under the August License Agreement DuoTech Holdings agreed to pay 3% of its "Gross Income" for non-exclusive products and 7% of "Gross Income" for exclusive products. "Gross Income" means "the result equal to the receipts from Royalty Sales for an Applicable Product during a

---

[11]/ During closing arguments neither side addressed the difference between the royalty rates for non-communion cup products, so we will not address it here.

quarter." (DX 22 at 3.) Using sales records that the defendants generated two or more years later, TCC created a demonstrative exhibit purporting to show that Compak (and by extension, its creditors) would have been substantially better off under the July License Agreement. DuoTech Holdings would not have had unfettered discretion to determine its "Costs of Manufacturing" under the July License Agreement, see Beraha, 956 F.2d at 1444-45, so its profits after 2003 are at least arguably relevant.

But ultimately, TCC's analysis does not establish that Compak failed to receive reasonably equivalent value for executing the August License Agreement. Cf. In re Joy Recovery, 286 B.R. at 75 ("Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors."). The most reliable evidence of the July License Agreement's value "as of the date of the transaction," id., would be evidence of the parties' performance under that agreement. But the July License Agreement was in place less than two months before the parties executed the superceding August agreement, and there is no evidence that the defendants made any sales during that time period. In essence, the parties swapped one executory contract for another. Trying to compare the two, neither of which required DuoTech Holdings to make any up-front

payments, is inherently speculative.[12]  Cf. In re Wellington Apartment, LLC, 350 B.R. 213, 245 (Bankr. E.D. Va. 2006) ("debtor received nothing of value for the transfer of its $1,615,000"); In re McCook Metals, L.L.C., 319 B.R. 570, 589 (Bankr. N.D. Ill. 2005) (finding no reasonably equivalent value in exchange of $11.1 million asset for a $7,826,959 note); In re Joy Recovery, 286 B.R. at ("However the transaction is viewed, Joy did not receive anything for the $1.8 million paid ultimately to Chang — no treasury stock, and no loan commitment.").  It is unclear how the July License Agreement's machine-sharing provision would have worked in practice.  Assuming that there was excess capacity to run the machine after filling Compak's orders — something about which there is no evidence — it is not clear to whom DuoTech Holdings would have sold its own products.  There is scant evidence in the record that anyone was interested in purchasing communion cups other than Compak's then-existing customers (and we presume that Compak would not have shared those sales with DuoTech Holdings).  So, we have no evidence that DuoTech Holdings sold communion cups under the July License Agreement, or even that such sales were likely to occur.  And as the defendants point out, if the agreements were to be compared with the benefit of hindsight, then we must account for the fact that the defendants did not make any

---

[12]/  This issue might be less problematic for TCC if there had been some evidence, independent of the July License Agreement, that the August License Agreement's royalty rate (3% of "Gross Income") was below the market rate for products of this kind. But there was none.

sales in 2001 and 2002.  There is no difference between 30% and 3% of $0, and defendants' failure to pay the minimum royalty amount in 2002 would have extinguished the July License Agreement.  That would not have made Compak's creditors meaningfully better off.

We conclude that the defendants are entitled to judgment on Count VII.

## F.    Count VIII (Breach of Contract)

Before trial the defendants moved to exclude "undisclosed damages."  See Fed. R. Civ. P. 26(a)(1)(A)(ii) (requiring litigants to disclose their damages "computation"); 26(e)(1)(A) (requiring litigants to update their Rule 26(a) disclosures); and 37(c) (barring the use at trial of information not disclosed pursuant to Rule 26(a) and (e) "unless the failure was substantially justified or is harmless."); see also Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 742 (7th Cir. 1998) ("[T]he sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless.").  At closing argument TCC indicated for the first time that it was seeking $33,164.08 in compensatory damages for breach of contract, broken down into three categories: (1) unpaid royalties based upon invoices that Communion, LLC assumed in the Communion Source sale ($5,343.84); (2) unpaid royalties based upon Communion, LLC's purported sales of inventory it acquired from UMI in the same transaction ($1,969.98); and (3) unpaid royalties based

upon Communion, LLC's sales of communion cups that it purchased from the defendants ($25,850.26). The third category, which accounts for the bulk of TCC's claimed damages, is a straightforward computation based on the August License Agreement. Carlson admitted during the trial that TCC is entitled to royalties based on those sales, he only denies that DuoTech Holdings failed to pay them. Cf. Robinson v. Champaign Unit 4 School Dist., No. 10-3351, 2011 WL 817442, *5 (7th Cir. Mar. 9, 2011) (slip op.) (indicating that a detailed damages computation may not be necessary when the defendant is able to make the computation itself). The first two categories of damages are perhaps less obvious, but still based upon the August License Agreement and other documents in defendants' possession. We conclude that TCC's failure to update its Rule 26(a) disclosures to include this information was harmless.

### 1. Unpaid Royalties for Royalty Sales by and/or to Communion, LLC

Under the August License Agreement DuoTech Holdings is required to pay TCC a royalty for all "Royalty Sales," defined as "all sales of Applicable Products by DUO-TECH or an Affiliate thereof." (DX 22 at ¶¶ 1, 4.) As defined in the August License Agreement, "Affiliate" "means with respect to any Person (the "Specified Person"), any Person other than the Specified Person directly or indirectly Controlling, Controlled by or under direct or indirect common Control with, the Specified Person." (Id. at ¶

1.) At least during the three years that Carlson was Communion, LLC's manager — 2006 to approximately the fall of 2008 — Communion, LLC was DuoTech Holdings' "Affiliate." Consequently, Communion, LLC's sales during this time period were "Royalty Sales" and DuoTech Holdings should have paid royalties to TCC for those sales. After initially denying that he knew what Communion, LLC did with the communion cups that it purchased from DuoTech Packaging, Carlson admitted that Communion, LLC resold the cups and further claimed that DuoTech Holdings had paid royalties for those sales. Carlson's about-face tends to undermine his credibility on this point, but we do not think this goes far enough to establish a breach of contract. TCC asks us to assume that for every sale to Communion, LLC there was a corresponding resale, that Communion, LLC charged the same prices as UMI (or else charged more), and that — contrary to Carlson's representation — the defendants did not pay royalties for any of those sales. This is simply too much guesswork to support either liability or damages.[13] TCC seemed to suggest during closing arguments that the defendants had the burden to show that they paid all the royalties that were due. Not so.

## 2. DuoTech Holdings' Refusal to Open its Books and Records for Inspection

---

[13] TCC's argument that there are unpaid royalties associated with the "open invoices" that were part of the Communion Source sale stands on a different footing, inasmuch as it is not strictly based on presumed sales by Communion, LLC. But TCC has not demonstrated that royalties were not paid in connection with those invoices. TCC's demonstrative exhibit is conclusory, and based in part on an exhibit that was not introduced into evidence.

We are not persuaded that TCC has proven a breach of contract based upon the defendants' refusal to open its books and records for inspection in response to two separate requests in 2005 and 2007. Before we issued our opinion in 2009 granting defendants' motion for partial summary judgment, it was unclear which party was entitled to claim the licensor's rights under the August License Agreement, including the right to inspect DuoTech Holdings' books and records. (DX 22 at § 4c.) This was one of the subjects of defendants' pending interpleader action. The parties to that lawsuit (including TCC) were not required to accept defendants' representation that they were accurately reporting royalties — they could have requested discovery to verify the deposited amounts. Defendants did not breach the August License Agreement by refusing to permit TCC to examine their books and records at a time when the parties were litigating whether TCC was a party to that agreement.

We conclude that the defendants are entitled to judgment on Count VIII.

## G.   Count X (Accounting)

Shortly before trial the defendants moved to dismiss TCC's accounting claim, and we took its motion under advisement. "An equitable accounting is an adjustment of the accounts of the parties and a rendering of the balance ascertained to be due." Drake Enterprises, Inc. v. Colloid Environmental Technologies Co., No. 08 C 6753, 2009 WL 1789355, *2 (N.D. Ill. June 24, 2009)

(citation and internal quotation marks omitted). The plaintiff must show "the absence of an adequate remedy at law and one of the following: (1) a breach of fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature." Id. (citation and internal quotation marks omitted). "Although an accounting cause of action was traditionally utilized as a means of obtaining access to relevant records, the need for a party to pursue an accounting cause of action in order to obtain such access has been greatly minimized in light of the modern federal discovery rules." Id. (quoting Didion Milling, Inc. v. Agro Distribution, LLC, Case No. 05-C-227, 2007 WL 702808, at *11 (E.D. Wis. March 2, 2007) (internal quotation marks omitted).

We agree with defendants that TCC has an adequate remedy at law: damages for breach of contract. See id. at *3 (dismissing a claim for an equitable accounting where the defendants also alleged breach of contract); see also 3Com Corp. v. Electronics Recovery Specialists, Inc., 104 F.Supp.2d 932, 941-42 (N.D. Ill. 2000)(same).[14] There is nothing that TCC might discover by way of an accounting that it could not have discovered by filing timely discovery requests. See 3Com, 104 F.Supp.2d at 942 (noting that the plaintiff was no worse off after the court dismissed its

---

[14] Both Drake and 3com recognize exceptions that would permit a plaintiff to pursue both breach of contract and an equitable accounting, but those exceptions do not apply here.

accounting claim because "the information it seeks in the accounting claim will likely be revealed during the discovery phase of this case."). TCC's legal remedy did not become inadequate simply because it elected not to conduct discovery after filing its Amended Complaint. Defendants' motion to dismiss TCC's accounting claim is granted.

## H.   Count XI, XII, XIII (Unfair Competition)

We discussed the elements of a claim for unfair competition in our opinion denying the defendants' motion for summary judgment:

> "[T]o prove a claim pursuant to 15 U.S.C. § 1125(a), a plaintiff must show (1) that its trademark may be protected and (2) that the relevant group of buyers is likely to confuse the alleged infringer's products or services with those of plaintiff." H-D Michigan, Inc. V. Top Quality Service, Inc., 496 F.3d 755, 759 (7th Cir. 2007) (citation and internal quotation marks omitted); see also Sullivan v. CBS Corp., 385 F.3d 772, 775-76 (7th Cir. 2004). TCC's trademark registration is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of [its] ownership of the mark, and of [its] exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration." 15 U.S.C. § 1115(a). Furthermore, it creates a "rebuttable presumption of use as of the filing date." Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 504 (7th Cir. 1992) (citing Rolley, Inc. v. Younghusband, 204 F.2d 209, 211 (9th Cir. 1953)).

Compak Companies, LLC v. Johnson, No. 03 C 7427, 2011 WL 686263, *3 (N.D. Ill. Feb. 17, 2011). TCC's claim is not based on the similarity of the marks, "Celebration Cup" and "Chasid Cup," as used by the parties in connection with their substantially similar communion-cup products. It is instead based on the alleged use of

"celebrationcup.com" to sell Chasid Cups.  But the defendants have never owned the rights to, nor used, the domain name "celebrationcup.com."  UMI registered the domain name and later sold its rights to Communion, LLC.  We have concluded that Communion, LLC and DuoTech Holdings were "Affiliates" as that term is defined in the August License Agreement, at least during the time that Carlson was Communion, LLC's manager.  But even for that time period the evidence is insufficient to establish that Communion, LLC was Carlson's alter ego.  If Communion, LLC used "celebrationcup.com" to sell communion cups supplied by the defendants, and this created a likelihood of confusion, then Communion, LLC is the infringer.  <u>Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.</u>, 316 U.S. 203 (1942), a case that TCC cited during closing arguments, does not support the relief that TCC requests.  In that case the defendant sold goods bearing a symbol that was confusingly similar to the plaintiff's mark.  <u>Id.</u> at 204. Here, there is no evidence that these defendants ever used the name "Celebration Cup" to sell their product.  <u>Cf.</u> <u>id.</u> at 205 ("Whether there was [] an infringement as to entitle the petitioner to the remedies provided by the federal trade-mark laws is [] not open here.").  This is fatal to all three counts alleging unfair competition, which are based on direct trademark infringement.

TCC raised a contributory infringement theory for the first time at closing argument.  <u>See</u> <u>Inwood Laboratories, Inc. v. Ives</u>

Laboratories, Inc., 456 U.S. 844, 854 (1982) ("[I]f a manufacturer
or distributor . . . continues to supply its product to one whom it
knows or has reason to know is engaging in trademark infringement,
the manufacturer or distributor is contributorially responsible for
any harm done as a result of the deceit.").[15]  "When an issue not
raised by the pleadings is tried by the parties' express or implied
consent, it must be treated in all respects as if raised in the
pleadings."  Fed. R. Civ. P. 15(b).  "The test for such consent is
whether the opposing party had a fair opportunity to defend and
whether he could have presented additional evidence had he known
sooner the substance of the amendment."  Matter of Prescott, 805
F.2d 719, 725 (7th Cir. 1986) (citation and internal quotation
marks omitted).  During the trial defendants repeatedly emphasized
the fact that Communion, LLC (and not the defendants) purchased the
rights to celebrationcup.com, while admitting that Carlson was
affiliated with, and DuoTech Packaging sold communion cups to,
Communion, LLC.  This opened the door to TCC's contributory
infringement theory, as defendants must have anticipated.  And we
doubt that they would have defended the case any differently if TCC

_____

[15]/  TCC cited a copyright case to support its argument, Broadcast Music,
Inc. v. Fox Amusement Co., Inc., 551 F.Supp. 104 (N.D. Ill. 1982).  We assume
that TCC is relying the portion of the court's opinion addressing the personal
liability of two officers for copyright infringement committed by the corporate
defendant.  Id. at 108.  This is vicarious rather than contributory infringement,
and Broadcast Music does not accurately reflect the standard for vicarious
trademark infringement.  See Hard Rock Cafe Licensing Corp. v. Concession
Services, Inc., 955 F.2d 1143, 1150 (7th Cir. 1992).  Even under the standard
articulated in Broadcast Music, there is not enough evidence concerning Carlson's
role at Communion, LLC to hold him vicariously liable for its actions.

had formally amended its complaint prior to trial to allege contributory infringement. They were hoping to capitalize on TCC's failure to conduct discovery: putting on more evidence would have only given TCC's counsel more to work with. We conclude that the defendants implicitly consented to try TCC's contributory infringement claim, but that TCC failed to prove the claim. The only evidence concerning Communion, LLC's use of the website dates from 2009, more than a year after DuoTech Packaging's last reported sale to Communion, LLC. There was no evidence at trial that Communion, LLC sold any communion-cups through either "communionsource.com" or "celebrationcup.com" in 2006, 2007, or 2008. <u>Mishawaka</u> articulates a policy strongly favoring the trademark owner once the plaintiff has proven infringement, <u>Mishawaka</u>, 316 U.S. at 206-207, but it does not shift the entire burden of proving unfair competition to the defendant. Even assuming that the evidence supported a finding that Communion, LLC committed unfair competition, TCC did not prove any damages or sales for which the defendants could be contributorially responsible. <u>Cf.</u> 15 U.S.C.A. § 1117 ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.").

We conclude that defendants are entitled to judgment on Counts XI, XII, and XIII.

## **CONCLUSION**

The defendants are entitled to judgment on Counts III, IV, VII, VIII, XI, XII, and XIII of TCC's Amended Complaint. TCC is entitled to a declaratory judgment on Count V of its Amended Complaint. Defendants' motion to dismiss Count X of TCC's Amended Complaint (176) is granted. Count X is dismissed with prejudice.


DATE:      April 28, 2011

ENTER:     _____

John F. Grady, United States District Judge